FILED
JUN 25 2008 EA
6-25-2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 08CV2933 PH |
| Plaintiff, | MOTION TO QUASH & SUPPRESS |
| v. | Before the Honorable<br>CHARLES R. NORGLE |
| FUNDS IN THE AMOUNT OF SEVENTY-FIVE<br>THOUSAND DOLLARS<br>($75,000) | United States District Court Northern<br>District of Illinois |
| Defendant. | |

## MOTION TO QUASH ARREST AND SUPPRESS EVIDENCE

NOW COMES the Claimant, DONALD WINCHELL, by and through his attorney, JOHN A. KRUPA of McDermott & Krupa, P.C., and moves this Honorable Court to quash arrest and suppress evidence. In support thereof, claimant states as follows:

### CONSTITUTIONAL PROVISIONS

1. The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures:

> The right of the People to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizes, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and in particularly describing the place to be searched, and the personas or things to be seized.
> U.S. Constitution, 4th Amendment

2. The Fourteenth Amendment of the United States Constitution extends the protections of the Fourth Amendment to actions by States holding no State shall "...deprive any person of life, liberty, or property, without due process of law." U.S. Constitution, 14th Amendment

3. Illinois' Constitution mirrors the protections in the U.S. Constitution, stating:

> All men are by nature free and independent and have certain inherent and inalienable rights among which are life, liberty, and the pursuit of happiness.
> Illinois Constitution, Article I

and

No person shall be deprived of life, liberty, or property without due process of law nor be denied the equal protection of the laws.
Illinois Constitution, Article II

## STANDING

4. Donald Winchell, (hereinafter referred to as "Donald"), has standing to prosecute this motion due to his possessory and ownership interests in the Defendant *res*.

5. Further, Donald has standing due to his reasonable expectation of freedom from government intrusion during his travel in his train room. U.S. v. Jeffers, 342 U.S. 48 (1951) and Mancusi v. DeForte, 392 U.S. 364 (1968).

## FACTS

6. Several days prior to October 27, 2007, Donald reserved a round trip train ticket for travel between Chicago, Illinois (Union Station) and Emeryville, California on Amtrak Train #5, sleeper car #532, compartment C via the internet. Donald upon arriving at the train station and paid cash for this train ticket ninety minutes prior to departure.

7. Prior to Amtrak Train #5 leaving Union Station in Chicago, Task Force Officer Romano, (hereinafter referred to as "Romano"), check the passenger manifest of Train #5 and determined that Donald had reserved his ticket a few days in advance via the internet and paid cash for the ticket ninety minutes prior to departure.

8. After purchasing the ticket, Donald boarded train #5, car #532, compartment C.

9. Donald did not check any baggage but had one suitcase which he carried on the train in his personal possession.

10. Donald's private leased room contained the amenities and privacy of a hotel room.

11. Upon Donald boarding the train, he mistakenly entered the wrong room and returned to the hallway to find the correct room.

12. At this time in the hallway, Romano requested Donald's destination. Donald replied room C and Romano directed Donald into the room already occupied by Task Force Officer Ivanich, (hereinafter referred to as "Ivanich"), and Task Force Officer Oggerino. Romano then followed Donald into the room.

13. Prior to this encounter with Donald, neither none of the officers checked Donald's criminal background at any time.

14. None of the officers observed Donald and his demeanor during his arrival at Union Station, his purchase of his ticket, and his boarding of the train until first contact in the hallway of car #532.

15. Upon arriving at his reserved room, Donald saw two males wearing DEA labeled attire in his room.

16. None of the officers secured a search warrant for Donald's room or any other area of Train #5 that day prior to entering the train to search for Donald or enter his room.

17. None of the officers requested Donald's permission to enter the room on the train.

18. None of the officers secured a search warrant for Donald's suitcase that day prior to entering the train to search for Donald or enter his room.

19. At no time during the events leading up to the officers' unlawful seizure of Donald's suitcase with the Defendant *res* and unlawful arrest of Donald, did Donald abandon his leased room or his suitcase.

20. Prior to the officer's unlawful seizure and arrest, Donald had no misdemeanor or felony criminal record either in Federal Court or State Court.

21. Prior to the officer's unlawful seizure and arrest, Donald had never been arrested nor convicted of any offense relating to illegal narcotics.

22. None of the officers received a "tip" regarding Donald's train travel, his participation in a drug transaction, his imminent participation in a drug transaction, or his transporting of drugs or currency associated with drug transactions.

23. At the time the officers began questioning Donald, none of them had any direct or indirect knowledge that Donald's suitcase or his person contained any contraband.

24. United State's Currency is not contraband.

25. None of the officers had a canine partner present on train #5, car #532 that day.

26. All of the officers entered Donald's room without seeking his permission even though they knew he had leased the premises for his travel.

27. After entering the room, Ivanich questioned Donald regarding his identification and travel documents.

28. Donald produced a valid Illinois Driver's License and his Amtrak train ticket. The ticket matched Donald's legal name. Ivanich returned the documents to Donald.

29. Ivanich questioned Donald about his travel plans. Donald answered he was going to visit his daughter in California.

30. Ivanich asked about the suitcase in the room and Donald stated his ownership of the suitcase.

31. Ivanich asked whether Donald packed the luggage. Donald answered yes.

32. Ivanich asked whether any other person had given him a package to take to California. Donald answered no.

7

33. Ivanich asked whether Donald was carrying any weapons, narcotics, or large amounts of currency. Donald answered no.

34. Ivanich asked whether Donald was carrying any prescription medication. Donald answered yes.

35. Ivanich then asked if Donald would consent to a search of his luggage. Donald answered no.

36. At no time had Donald violated any federal, state, or municipal laws or ordinances.

37. At this time, none of the officers had any direct or indirect knowledge that Donald had contraband in his suitcase.

38. Ivanich then stated that he was seizing Donald's luggage without Donald's consent and would not allow him to travel with his suitcase until a narcotic odor investigation could be conducted upon the bag.

39. The officers did not arrange for a narcotics dog to be present on the train, platform, or any place in public close to Donald's train.

40. Donald was left without any options. He could not leave without his suitcase so Ivanich's unlawful seizure of Donald's suitcase acted as an unlawful arrest of Donald because he was not free to leave.

41. The officers carried Donald's suitcase and would not let him carry it from the train.

42. The officers escorted Donald to an officer in Union Station a substantial distance from his train and placed Donald in a room.

43. The officers escorted Donald to a room in Union Station a substantial distance from Donald's train and it's imminent departure.

44. Upon reaching the room, the officers removed Donald's bag to another room out of his sight at this time.

45. Only after placing Donald's bag into an environment under the officers' complete control and not in a public space did the officers' secure a narcotic's dog to investigate the luggage.

46. The narcotic investigation did not occur in Donald's presence.

47. After the officers' placed Donald's bag in the separate, Donald never saw the method of the officer's search, nor the method of opening his suitcase.

48. The officers used their status and position to intimidate Donald.

49. Donald desired to continue his trip.

50. The delay caused by the officer's investigation of Donald's suitcase caused Donald to miss his train.

51. None of the officers indicated to Donald that he could end the interrogation at any time.

52. None of the officers indicated to Donald that he did not need to speak with the officers.

53. None of the officers read to Donald his Miranda Rights.

## ARGUMENT

54. The Exclusionary Rule for a violation of an individual's Fourth Amendment rights applies to forfeiture proceedings because of the quasi-criminal nature of the forfeiture. One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693 (1965).

55. The Fourth Amendment prohibits unreasonable searches and seizures and this right applies to the States through the Fourteen Amendment. The Courts have regular upheld the importance of preventing arbitrary state action without authority. "The knock at the door, whether by day or by night, as a prelude to a search, without authority of law but *solely on the authority of the police,* did not need the commentary of recent history to be condemned as

9

inconsistent with conception of human rights enshrined in the history and the basic constitutional documents of English-speaking peoples." Wolf v. Colorado, 338 U.S. 25 (1949), emphasis added.

56. This Fourth Amendment right exists in public and private spaces. Terry v. Ohio, 392 U.S. 1 (1968). It exists in temporary dwellings. Stoner v. California, 376 U.S. 483 (1964). And, it even exists in a person's luggage. U.S. v. Place, 462 U.S. 696 (1983).

57. However, this Fourth Amendment right has limits and exceptions. The most recognizable exception occurs when a police officer makes an investigatory stop to protect his own or the public's safety. The Supreme Court in *Terry* stated

> We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.
> Terry at 30.

58. In *Terry*, the Supreme Court held that the officer could conduct an investigatory frisking of the defendants after observing them walking past and looking into a storefront numerous times within a brief period of time.

59. In the instant case, the officer here did not have any reason to conduct a 'Terry Stop' on Donald. The officers checked a manifest to secure information regarding Donald's whereabouts, did not search for him before boarding the train, and in fact were waiting for him at his leased room. The officers did not see any mannerism prior to contacting Donald that would indicate that he was imminently about to commit a crime, thus requiring immediate police response. The police received not 'tip' regarding Donald's trip or his possessions. The officers had no

10

articulable suspicion of criminal activity greater than a mere hunch to warrant an investigative stop of Donald.

60. Furthermore, the officers lacked the public element of the 'Terry Stop.' As soon as Donald entered his leased room before the officers began their investigation, he left the public sphere. Any investigation at that time would not qualify under the 'Terry Stop' exception.

61. Lastly, Donald produced valid identification, travel documents and answered routine questions made by the officers regarding his travel arrangements and nature of his luggage. None of the questions or answers created a reasonable suspicion of an immediate criminal activity to warrant a 'Terry Stop.'

62. Because the officers did not attempt to frisk or otherwise search Donald's person, the question becomes what protections set forth in *Terry* apply to Donald's suitcase.

63. The Supreme Court has held that "[p]articularly in the case of detention of luggage within a traveler's immediate possession, the police [an investigatory stop 'Terry Stop'] intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary." Place at 709. An officer may only detain luggage in a public place within the limits of a 'Terry Stop.' Absent probable cause, a 'Terry Stop' investigation of luggage in a public place does not violate a person's Fourth Amendment privacy rights when the officer's detention minimally intrudes upon the person, in light of strong law enforcement interests. Place at 703.

64. Applying the 'Terry Stop' standards to the instant case, the Supreme Court has held that detention of a person's luggage for ninety minutes to conduct a drug dog narcotic odor test violates the Fourth Amendment. The Court reasonably held the officers could have easily

secured a drug dog in advance to conduct the investigation to avoid the length of the investigation. The Court held that

> [m]inimally, in assessing the effect of the length of the detention, we take into account whether police diligently pursue their investigation. We note that . . . agents knew of the time of Place' scheduled arrival at LaGuardia, had ample time to arrange for their additional investigation at that location, and thereby could have minimized the intrusion on respondent's Fourth Amendment interests.
> Place at 709

65. In *Place*, officers in Miami became suspicious of the respondent while he was moving through a security line, but could not effectuate a stop at that time. They then notified New York police, who stopped place upon debarking from the plane.

66. In the instant case, the officers had several days notice of Donald's reservation and at least ninety minutes notice in Union Station that Donald paid for his ticket, thus committing himself to the trip.

67. Furthermore, the officers were in no hurry to find Donald because they did not search the terminal but went straight to Donald's room on the train. And in fact, the officers arrived first at Donald's room on the train.

68. Since the officers were able to beat Donald to his room on the train and admitted to having direct knowledge of Donald's confirmed travel plans at least ninety minutes prior to departure, the officer had more than enough time to secure a drug dog to accompany for their questioning of Donald.

69. Lastly, the officers' detention of Donald's suitcase, and thus Donald, stretched in excess of ninety minutes because Donald was not able to continue with his itinerary.

70. The officers' conduct in seizing Donald's suitcase to do a further investigation does not fall under the 'Terry Stop' exception to the Fourth Amendment. The officers unlawfully seized

12

Donald's suitcase in violation of the Fourth Amendment. Only by securing a search warrant prior to seizing Donald's suitcase and removing it from the train could the officers conduct a further investigation of Donald's suitcase. U.S. v. Vantressa, 380 U.S. 102 (1965) and Terry.

71. Next, the Fourth Amendment protections have been extended to temporary stays in hotel rooms for the duration of the occupancy. Hoffa v. U.S., 385 U.S. 293 (1966). Donald's leased room on Amtrak Train #5, car #532, room C squarely fit within the definition of a hotel room to allow the expectation of privacy to extend to this location. The room on the train mirrored a hotel room in that it is leased for a set period of time, the lessee protects his property and privacy with a door, and the room s contains the same amenities as a hotel room.

72. Donald could have nothing less than a reasonable expectation of privacy while in this train compartment. He purchased a private room on the train, he was to solely occupy the room during the trip, and the room could be closed off from the public via a door.

73. At no time did Donald consent to allow the officers to enter this room, and the officers did not have a search warrant to enter the room.

74. As soon as Donald entered his room, he was not free to leave and not free to dispose of his property, the suitcase, as he desired.

75. Furthermore, the officers did not have probable cause to enter this room. If the officers had probable cause, they had several days notice of Donald's travel plans to secure a warrant to search the room. At the time of Donald's reservation for the train ticket, the officers knew the same set of facts as at the time they entered Donald's train room.

76. The officers' failure to secure a search warrant to enter Donald's train room violated Donald's Fourth Amendment rights to unreasonable searches and seizures.

13

77. The officer may only have entered Donald's train room to conduct their investigation if they had exigent circumstances, allowing entry by the officers without a warrant when a compelling need for action exists without time to secure a warrant. Michigan v. Taylor, 436 U.S. 499 (1978).

78. When an officer conducts a search without a warrant, the officer conducting the search must have probable cause to believe "...the facts and circumstances with [his or her] knowledge ... [are] sufficient in themselves to warrant a man of reasonable caution in belief that an offense has been of is being committed." U.S. v. Faison, 195 F.3d 890 (7th Cir. 1999) "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." Terry at 21.

79. Furthermore, the refusal of a person to answer questions, as is his Constitutional right, or refusal to consent to the search of his person, premise, or property cannot form the basis of a reasonable suspicion or probable cause. U.S. v. Skidmore, 894 F2d 925 (7th Cir. 1990).

80. In the instant case, the officers had no exigent circumstances that would allow a search of Donald, his train room, or his suitcase without a warrant. The officers knew the following facts at the time of the seizure, in total: 1) Donald reserved a train ticket several days in advance of departure, 2) Donald paid for his ticket in cash, 3) Donald did not have a criminal background, 4) Donald was not acting suspiciously after arrival at the station and prior to boarding the train, 5) provided valid identification that matched his travel itinerary, 6) Donald owned and possessed his suitcase, 7) Donald packed his suitcase himself, 8) no other person gave Donald a package to take to California, and 9) after answering questions, Donald refused to consent to the search of his bag.

14

81. It is impossible to believe that the officers in this case with the facts set forth above had a reasonable suspicion or probable cause to search Donald, his train, room, or his suitcase.

82. Given the lack of reasonable suspicion, probable cause, or exigent circumstances, this Court must grant Claimant's Motion to Quash Arrest and Suppress Evidence.

83. The officer's in this case cannot 'bootstrap' their claim to reasonable suspicion or probable cause because of any actions taken after the unlawful seizure. The Seventh Circuit has held that:

> [w]e may not justify the search after the fact, once we know illegal activity was afoot; the legitimate expectation of privacy does not depend on the defendant' activities, whether innocent or criminal. If this were the case, then the police could enter private homes without warrants, and if they find drugs, justify the search by citing the rule that society is not prepared to accept as reasonable an expectation of privacy in crack cocaine kept in private homes. Presumably if no narcotics are found . . . the owner of the home would be able to bring a civil lawsuit for nominal damages for the technical violation of privacy rights. The Fourth Amendment requires more than this.
> U.S. v. Pitts, 322 F.3d 449 (7th Cir. 2003)

84. Also, U.S. Currency cannot be contraband for the purpose of justifying an unlawful search and seizure under the Fourth Amendment.

> The existence of any sum of money, standing alone, is not enough to establish probable cause to believe the money is forfeitable . . . . As far as we can tell, no court in the nation has yet held that, standing alone, the mere existence of currency, even a lot of it, is illegal. We are certainly unwilling to be the first to so hold.
> U.S. v. $506,231 in U.S.C., 125 F3d 442 (7th Cir. 1997).

85. The officers violated Donald's constitutional right to privacy and possession of his suitcase by relying on a mere hunch, the purchase of a train ticket. These officers have demonstrated that they will continue to make these unlawful seizures, even though this Court has ruled against their behavior. And, in most cases their unlawful seizures do not go challenged, because the claimants are scared or do not have the financial resources to challenge the illegality. To allow the officers, actually the United State's Government, to continue to conduct searches in

15

this manner will ultimately erode the purpose of the Fourth Amendment of the U.S. Constituion, making it a paper tiger. Without the protections of the Constitution, we may as well put our liberty at the hands of a dictator.

86. The Claimant, Donald Winchell, seeks to quash the arrest and suppress any evidence secured after the seizure of his suitcase. In particular, the Claimant seeks to suppress the evidence of the existence of the Defendant *res*, namely Seventy Five Thousand Dollars and NO/100 ($75,000.00) in U.S. Currency unlawfully seized in this matter and the results of any examinations or tests conducted upon the Defendant *res*.

WHEREFORE, the Claimant, Donald Winchell, respectfully requests that this Honorable Court grant his Motion to Quash Arrest and Suppress Evidence of the Defendant *res* and and the results of any examinations or tests conducted upon the Defendant *res*.

Respectfully submitted:

JOHN A. KRUPA

Law Firm of McDermott & Krupa, P.C.
jkrupa@krupalaw.com
4747 Lincoln Mall Drive, Suite 304
Matteson, Illinois 60443
Telephone: (708) 747-4500
Facsimile: (708) 747-4510
Attorney for Claimant